**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| AUTONAVIGARE LLC,<br><br>Plaintiff,<br><br>v.<br><br>HYUNDAI MOTOR COMPANY, HYUNDAI MOTOR AMERICA, HYUNDAI CAPITAL AMERICA, KIA CORPORATION, and KIA AMERICA, INC.,<br><br>Defendants. | CIVIL ACTION NO. 2:26-cv-00712<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff AutoNavigare LLC ("AutoNavigare") files this Complaint against Defendants Hyundai Motor Company, Hyundai Motor America, Hyundai Capital America, Kia Corporation, and Kia America, Inc. (collectively, "Hyundai-Kia") for infringement of U.S. Patent No. 7,640,104 ("the '104 Patent"), U.S. Patent No. 7,653,482 ("the '482 Patent"), U.S. Patent No. 7,725,254 ("the '254 Patent"), U.S. Patent No. 8,694,232 ("the '232 Patent"), U.S. Patent No. 8,886,398 ("the '398 Patent"), and U.S. Patent No. 9,766,801 ("the '801 Patent") (collectively, the "Asserted Patents").

**THE PARTIES**

1. Plaintiff AutoNavigare LLC is a Texas limited liability company located in Houston, Texas.

2. Defendant Hyundai Motor Company ("Hyundai-KR") is a corporation organized and existing under the laws of South Korea, having its principal place of business at 12 Heolleung-ro, Seocho-gu, Seoul, 06797, South Korea. Hyundai-KR operates in the United States, including

in the State of Texas and this District, directly or through its subsidiaries, agents, affiliates, and/or intermediaries.

3. Defendant Hyundai Motor America ("Hyundai-US") is a corporation organized and existing under the laws of the State of California, having its principal place of business at 10550 Talbert Ave, Fountain Valley, CA 92708 and a place of business at Hyundai-US's Southern Central Regional Office, 1421 S Belt Line Rd, Coppell, TX 75019. Hyundai-US is a wholly owned subsidiary of Hyundai-KR. Hyundai-US may be served through its registered agent Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701. Hyundai-US is registered to do business in the State of Texas and has been since at least May 13, 1986.

4. Defendant Hyundai Capital America ("HCA") is a corporation organized and existing under the laws of the State of California, having its principal place of business at 3161 Michelson Drive, Suite 1900, Irvine, CA 92612 and a place of business at 6100 W Plano Pkwy, Suite 2000, Plano, TX 75093. HCA is a majority-owned (80 percent) subsidiary of Hyundai-US. HCA may be served through its registered agent National Registered Agents, Inc., 1999 Bryan St, Suite 900, Dallas, TX 75201. HCA is registered to do business in the State of Texas and has been since at least December 12, 1989.

5. Hyundai-KR, through at least the activities of its U.S.-based subsidiaries, including Hyundai-US, is engaged in making, using, offering for sale, selling and/or importing vehicles having infotainment systems with navigation, driver assist, and/or multimedia device integration capabilities (the "Accused Products")[1] to and throughout the United States, including this District. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may

[1] *See, e.g.*, Exhibits J-U.

be subject to personal jurisdiction because of the activities of its agent within the forum state….”); *see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) (“The agency theory may be applied not only to parents and subsidiaries, but also to companies that are ‘two arms of the same business group,’ operate in concert with each other, and enter into agreements with each other that are nearer than arm’s length.”).

6. On information and belief, Hyundai-KR controls (and has controlled) Hyundai-US, as well as many other subsidiaries. On information and belief, Hyundai-US provides (and has provided) sales, distribution, testing, research, and/or development support in the United States for its ultimate parent, Hyundai-KR. Hyundai-US is, and has been, an agent of Hyundai-KR. *See, e.g.*, https://static.nhtsa.gov/odi/frcl/2016/FRCL-16F045-7133.pdf (Hyundai-U.S. submitting U.S. regulatory submissions “on behalf of Hyundai Motor Company”). Hyundai-KR and/or its respective agents and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, purposefully direct (and have directed) the Accused Products into established distribution channels within this District and the U.S. nationally. At the direction and control of Hyundai-KR, its subsidiaries, including Hyundai-US, have made, used, sold, offered for sale, and/or imported and continue to make, use, sell, offer for sale, and/or import Accused Products in the United States and this District.

7. Defendant Hyundai-KR is the ultimate parent company of Hyundai-US and HCA and, as the ultimate parent, induces its subsidiaries, agents, affiliates, intermediaries, retail partners, and customers to engage in making, using, selling, offering for sale, and/or importing Accused Products to and throughout the United States, including this District.

8. Hyundai-US is engaged in making, using, offering for sale, selling and/or importing Accused Products to and throughout the United States, including this District.

9. Hyundai-US induces its affiliates, intermediaries, retail partners, dealerships, and customers to engage in making, using, selling, offering for sale, and/or importing Accused Products to and throughout the United States, including this District.

10. HCA induces its affiliates, intermediaries, retail partners, dealerships, and customers to engage in making, using, selling, offering for sale, and/or importing Accused Products to and throughout the United States, including this District.

11. Hyundai-KR, Hyundai-US, and HCA (and their subsidiaries, affiliates and/or intermediaries) form an interrelated group of companies doing business as a collective whole under the Hyundai/Genesis brands, which together comprise one of the largest makers and sellers of automotive vehicles in the world. Hyundai-KR, Hyundai-US, and HCA are part of the same corporate structure and distribution chain for the making, using, selling, offering for sale, and/or importing the accused vehicles in the United States, including in Texas generally and this District in particular. On information and belief, Hyundai-KR, Hyundai-US, and HCA (and their subsidiaries, affiliates and/or intermediaries) share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused vehicles and technologies. Thus, Hyundai-KR, Hyundai-US, and HCA (and their subsidiaries, affiliates and/or intermediaries) operate as a unitary business and are jointly and severally liable for the acts of patent infringement alleged herein. Hyundai-KR, Hyundai-US, and HCA are referred to herein collectively as "Hyundai."

12. Hyundai has substantial operations in Texas including regional operations, finance operations, parts distribution, dealerships, and supplier/logistics activities.

| FACILITY | FACILITY TYPE | STATE | DISTRICT |
|---|---|---|---|
| Hyundai Capital America Plano Texas TX-04 | Finance | Texas | TX-04 |
| Hyundai Motor America Regional Office Coppell Texas TX-24 | Sales/Training/Zone Office | Texas | TX-24 |

*See, e.g.*, https://autosdriveamerica.org/member/hyundai/.

13. Hyundai maintains an office located in this District.

Assistant Manager, Regional Aftersales Ops (SCR)

**Date:** May 6, 2026
**Location:** Plano, TX, US, 75093
**Job Req ID:** 3288

At Hyundai, we've rethought our business and created cars that combine performance, quality, design and innovation into a complete package.

Primary Location: United States-Texas-Plano
Work Locations: Dallas, TX 6100 W. Plano Parkway, Suite 2000 Suite 2000 Plano 75093

*See* https://careers-americas.hyundai.com/hma/job/Plano-Assistant-Manager%2C-Regional-Aftersales-Ops-%28SCR%29-TX-75093/1388768300/; https://hyundaicapital.taleo.net/careersection/hca/jobdetail.ftl?job=260000F8&tz=GMT-05%3A00&tzname=America%2FChicago (annotations in red added).

14. Defendant Kia Corporation ("Kia-KR") is a corporation organized and existing under the laws of South Korea, having its principal place of business at 12 Heolleung-ro, Seocho-gu, Seoul, 06797, South Korea. Kia-KR is minority-owned (35.17 percent) by Hyundai-KR, and, in turn, Kia-KR is a minority owner of more than fifteen Hyundai-KR subsidiaries, joint ventures, and/or associates, including Defendant HCA.[2] Kia-KR operates in the United States, including in

[2] *See* Hyundai-KR's 2026 Q1 Consolidated Financial Statements, at p. 27, available at https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/investor-

the State of Texas and this District, directly or through its subsidiaries, agents, affiliates, and/or intermediaries.

15. Defendant Kia America, Inc. ("Kia-US") is a corporation organized and existing under the laws of the State of California, having its principal place of business at 111 Peters Canyon Rd, Irvine, CA 92606 and a place of business at 5810 Tennyson Pkwy, Suite 400, Plano, TX 75024. Kia-US is a wholly owned subsidiary of Kia-KR. Kia-US may be served through its registered agent CT Corporation System, 999 Bryan St, Suite 900, Dallas, TX, 75201. Kia-US is registered to do business in the State of Texas and has been since at least May 26, 1994.

16. Kia-KR, through at least the activities of its U.S.-based subsidiaries, including Kia-US, is engaged in making, using, offering for sale, selling and/or importing Accused Products to and throughout the United States, including this District. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state…."); *see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

17. On information and belief, Kia-KR controls (and has controlled) Kia-US, as well as many other subsidiaries. On information and belief, Kia-US provides (and has provided) sales, distribution, testing, research, and/or development support in the United States for its ultimate parent Kia-KR, which owns Kia-US. Kia-US is, and has been, an agent of Kia-KR. *See, e.g.*,

---

relations/financial-Information/report-en/2026/2026-q1-consolidated-audit-report-en.pdf; *see also* Kia-KR's 2025 Q4 Consolidated Financial Statements, at p. 24, available at https://worldwide.kia.com/en/company/investor-relations/financial/reports.

https://static.nhtsa.gov/odi/inv/2018/INCBC-DP18003-12151P1.pdf (Kia-U.S. submitting U.S. regulatory submissions "on behalf of [] Kia Motors Corporation"). Kia-KR and/or its respective agents and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, purposefully direct (and has directed) the Accused Products into established distribution channels within this District and the U.S. nationally. At the direction and control of Kia-KR, its subsidiaries, including Kia-US, have made, used, sold, offered for sale, and/or imported and continue to make, use, sell, offer for sale, and/or import Accused Products in the United States and this District.

18. Defendant Kia-KR is the parent company of Kia-US and, as the parent, induces its subsidiaries, agents, affiliates, intermediaries, retail partners, and customers to engage in making, using, selling, offering for sale, and/or importing Accused Products to and throughout the United States, including this District.

19. Kia-US is engaged in making, using, offering for sale, selling and/or importing Accused Products to and throughout the United States, including this District.

20. Kia-US induces its affiliates, intermediaries, retail partners, dealerships, and customers to engage in making, using, selling, offering for sale, and/or importing Accused Products to and throughout the United States, including this District.

21. Kia-KR and Kia-US (and their subsidiaries, affiliates and/or intermediaries) form an interrelated group of companies doing business as a collective whole under the Kia brand which together comprise one of the largest makers and sellers of automotive vehicles in the world. Kia-KR and Kia-US are part of the same corporate structure and distribution chain for the making, using, selling, offering for sale, and/or importing the accused vehicles in the United States, including in Texas generally and this District in particular. On information and belief, Kia-KR and Kia-US (and their subsidiaries, affiliates and/or intermediaries) share the same management,

common ownership, advertising platforms, facilities, distribution chains and platforms, and accused vehicles and technologies. Thus, Kia-KR and Kia-US (and their subsidiaries, affiliates and/or intermediaries) operate as a unitary business and are jointly and severally liable for the acts of patent infringement alleged herein. Kia-KR and Kia-US are referred to herein collectively as "Kia."

22. Kia has a meaningful Texas footprint, including regional operations, training facilities, parts distribution infrastructure, dealerships, and supplier/logistics activities.

| FACILITY | FACILITY TYPE | STATE | DISTRICT |
|---|---|---|---|
| Kia Regional Office Plano Texas TX-04 | Sales/Training/Zone Office | Texas | TX-04 |
| Kia Training Center Lancaster Texas TX-30 | Sales/Training/Zone Office | Texas | TX-30 |
| Mobis Parts Distribution Center (Hyundai/Kia) Lancaster Texas TX-30 | Parts Center | Texas | TX-30 |

*See, e.g.*, https://autosdriveamerica.org/member/kia/.

23. Kia's Southwest Region Office is located in this District.



*See* https://www.linkedin.com/company/kia-america/about/; *see also* https://careers-americas.kia.com/kus/content/Location/.

24. Defendant Hyundai-KR is Defendant Kia-KR's largest shareholder, owning 35.17 percent of Kia-KR.[3] Further, Kia-KR is a minority owner of more than fifteen Hyundai-KR subsidiaries, joint ventures, and/or associates ranging from 5.24 percent to 40.43 percent, including having the remaining 20 percent ownership interest through Kia-US in Defendant HCA.[4] Hyundai-KR (and its subsidiaries, affiliates and/or intermediaries) and Kia-KR (and its subsidiaries, affiliates and/or intermediaries) are strongly affiliated and operate as an integrated automotive conglomerate by commingling ownership and, on information and belief, sharing management, facilities, advertising platforms, distribution chains, development processes, financing operations, and incorporating substantially similar systems in their vehicles, including the same infotainment, navigation, driver assist, and multimedia device integration systems subject to this action. For example, Hyundai-KR and Kia-KR "jointly conduct R&D activities." https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/investor-relations/financial-Information/report-en/2025/2025-q4-consolidated-audit-report-en.pdf, at p. 83. As another example, HCA does business under Kia financing brands. *See* https://banking.delaware.gov/wp-content/uploads/sites/73/2026/06/WEB-JUN-26-Motor-Vehicle-Sales-Finance.pdf, at p. 6.

25. Hyundai-Kia does business itself, or through its subsidiaries, agents, affiliates, and/or intermediaries, in the State of Texas and the Eastern District of Texas. Hyundai-Kia places

[3] *See* Hyundai-KR's 2026 Q1 Consolidated Financial Statements, at p. 27, available at https://www.hyundai.com/content/dam/hyundai/ww/en/images/company/investor-relations/financial-Information/report-en/2026/2026-q1-consolidated-audit-report-en.pdf.

[4] *See* Kia-KR's 2025 Q4 Consolidated Financial Statements, at p. 24, available at https://worldwide.kia.com/en/company/investor-relations/financial/reports.

or contributes to placing, infringing vehicles, including one or more of those specifically accused of infringement below, into the stream of commerce via established distribution channels, knowing or understanding that such vehicles would be sold and used in, and imported into, the United States, including in this District.

26. Hyundai-Kia has derived substantial revenue from infringing acts in this District, including from the sale and use of infringing vehicles like those specifically accused of infringement below.

27. Hyundai-Kia is engaged in making, using, offering for sale, selling and/or importing Accused Products to and throughout the United States, including this District.

28. This suit is commenced against all Defendants pursuant to 35 U.S.C. § 299 in a single action because, *inter alia*, as described above, the Hyundai and Kia Defendant entities share portions of the same corporate structure, including research and development, supply chain sourcing, manufacturing, and marketing efforts. In addition, the Hyundai and Kia Defendants incorporate the same hardware and software products that comprise the Accused Products.[5] Accordingly, questions of fact common to all Defendants will arise in this action.

**JURISDICTION AND VENUE**

29. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

30. This Court has specific and general personal jurisdiction over Hyundai-KR

---

[5] *See, e.g.*, https://update.hyundai.com/CA/EN/updateNoticePopup/GACbZ4; https://update.kia.com/CA/EN/updateNoticePopup/aVX0Pr; https://update.genesis.com/CA/EN/updateNoticePopup/Y2UiWL (Showing Hyundai, Kia, and Genesis vehicles incorporate the same hardware and software products that comprise the Accused Products (e.g., “Gen5” and “Gen5W” systems)).

consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, Hyundai-KR: (i) directly or through affiliates, subsidiaries, agents, or intermediaries, has committed and continues to commit acts of patent infringement in Texas, including by making, using, offering to sell, selling, and/or importing the accused products into Texas; (ii) directly or through affiliates, subsidiaries, agents, or intermediaries, purposefully supplies and directs the Accused Products for storage, inventory, and sales by distributors and resellers in Texas; and (iii) directly or through affiliates, subsidiaries, agents, or intermediaries, delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in Texas. For example, Hyundai-KR's vehicles have been sold, and are available for sale, in this District at numerous dealerships. In addition, or in the alternative, this Court has personal jurisdiction over Hyundai-KR pursuant to Fed. R. Civ. P. 4(k)(2).

31. This Court has specific and general personal jurisdiction over Hyundai-US and HCA consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, Hyundai-US and HCA: (i) have engaged in continuous, systematic, and substantial business in Texas; (ii) maintain a place of business in Texas and in this District; (iii) are registered to do business in Texas; and (iv) have committed, and continue to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State and this District. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing Accused Products (as more particularly identified and described throughout this Complaint) in this State and this District and/or inducing others to commit acts of patent infringement in this State and District. Indeed, Hyundai-US and

HCA have purposefully and voluntarily placed, and continue to place, one or more Accused Products into the stream of commerce through established distribution channels (including the Internet) with the expectation and intent that such products will be sold to, and purchased by, consumers in the United States, this State, and this District; and with the knowledge and expectation that such products (whether in standalone form or as integrated in downstream products) will be imported into and/or sold within the United States, this State, and this District.

32. In addition, Hyundai has derived substantial revenues from its infringing acts occurring within this State and this District, which includes at least part of the whole of its infringing activities alleged herein. Hyundai also derives substantial revenues from regularly and persistently doing or soliciting business in this State and this District, which includes substantial revenue from infringing goods offered for sale and sold in this State and this District and services provided to Texas residents directly and/or vicariously through and/or in concert with its agents, intermediaries, distributors, importers, and subsidiaries.

33. Further, Hyundai has knowingly induced, and continues to knowingly induce, infringement within this State and this District by advertising, marketing, financing, offering for sale and/or selling Accused Products (as more particularly identified and described throughout this Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, financing, offering for sale and/or selling of Accused Products is directed to consumers, customers, manufacturers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes the provision of instructions, user manuals, advertising, marketing materials, and/or financing support that facilitate, direct, and encourage the use of infringing products and related functionality with Hyundai's knowledge thereof.

34. Hyundai has, in the multitude of ways described above, availed itself of the benefits

and privileges of conducting business in this State and willingly subjected itself to this Court's exercise of personal jurisdiction over it. Hyundai also has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District and its acts of patent infringement as alleged herein that are purposefully directed towards this State and District.

35. Venue is proper as to Hyundai-KR in this District under 28 U.S.C. § 1391(c) because, *inter alia*, Hyundai-KR is a foreign corporation.

36. Venue is proper as to Hyundai-US and HCA in this District under 28 U.S.C. §§ 1391 and 1400(b) because, among other things: (i) Hyundai-US and HCA are subject to personal jurisdiction in this District; (ii) Hyundai-US and HCA have committed acts of patent infringement in this District; and (iii) Hyundai-US and HCA have at least one regular and established place of business in this District, including at 6100 W Plano Pkwy, Suite 2000, Plano, TX 75093.

37. This Court has specific and general personal jurisdiction over Kia-KR consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, Kia-KR: (i) directly or through affiliates, subsidiaries, agents, or intermediaries, has committed and continues to commit acts of patent infringement in Texas, including by making, using, offering to sell, selling, and/or importing the accused products into Texas; (ii) directly or through affiliates, subsidiaries, agents, or intermediaries, purposefully supplies and directs the accused products for storage, inventory, and sales by distributors and resellers in Texas; and (iii) directly or through affiliates, subsidiaries, agents, or intermediaries, delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in Texas. For example, Kia-KR's vehicles have been sold, and are available for sale, in this District at numerous dealerships. In addition, or in the alternative, this Court has personal jurisdiction over Kia-KR pursuant to Fed. R. Civ. P. 4(k)(2).

38. This Court has specific and general personal jurisdiction over Kia-US consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because, among other things, Kia-US: (i) has engaged in continuous, systematic, and substantial business in Texas; (ii) maintains a place of business in Texas and in this District; (iii) is registered to do business in Texas; and (iv) has committed, and continues to commit, directly or through intermediaries (including subsidiaries, agents, distributors, affiliates, retailers, suppliers, integrators, customers, and others), acts of patent infringement in this State and this District. Such acts of infringement include making, using, testing, offering for sale, selling, and/or importing Accused Products (as more particularly identified and described throughout this Complaint) in this State and this District and/or inducing others to commit acts of patent infringement in this State and District. Indeed, Kia-US has purposefully and voluntarily placed, and continues to place, one or more Accused Products into the stream of commerce through established distribution channels (including the Internet) with the expectation and intent that such products will be sold to, and purchased by, consumers in the United States, this State, and this District; and with the knowledge and expectation that such products (whether in standalone form or as integrated in downstream products) will be imported into and/or sold within the United States, this State, and this District.

39. In addition, Kia has derived substantial revenues from its infringing acts occurring within this State and this District, which includes at least part of the whole of its infringing activities alleged herein. Kia also derives substantial revenues from regularly and persistently doing or soliciting business in this State and this District, which includes substantial revenue from infringing goods offered for sale and sold in this State and this District and services provided to Texas residents directly and/or vicariously through and/or in concert with its agents,

intermediaries, distributors, importers, and subsidiaries.

40. Further, Kia has knowingly induced, and continues to knowingly induce, infringement within this State and this District by advertising, marketing, offering for sale and/or selling Accused Products (as more particularly identified and described throughout this Complaint) that incorporate the fundamental technologies covered by the Asserted Patents. Such advertising, marketing, offering for sale and/or selling of Accused Products is directed to consumers, customers, manufacturers, integrators, suppliers, distributors, resellers, partners, and/or end users, and this includes the provision of instructions, user manuals, advertising, and/or marketing materials that facilitate, direct, and encourage the use of infringing products and related functionality with Kia's knowledge thereof.

41. Kia has, in the multitude of ways described above, availed itself of the benefits and privileges of conducting business in this State and willingly subjected itself to this Court's exercise of personal jurisdiction over it. Kia also has sufficient minimum contacts with this forum through its transaction of substantial business in this State and this District and its acts of patent infringement as alleged herein that are purposefully directed towards this State and District.

42. Venue is proper as to Kia-KR in this District under 28 U.S.C. § 1391(c) because, *inter alia*, Kia-KR is a foreign corporation.

43. Venue is proper as to Kia-US in this District under 28 U.S.C. §§ 1391 and 1400(b) because, among other things: (i) Kia-US is subject to personal jurisdiction in this District; (ii) Kia-US has committed acts of patent infringement in this District; and (iii) Kia-US has at least one regular and established place of business in this District, including Kia's Southwest Region Office at 5810 Tennyson Pkwy, Suite 400, Plano, TX, 75024.

**DEFENDANTS' PRE-SUIT KNOWLEDGE OF ITS INFRINGEMENTS**

44. Prior to filing this Complaint, AutoNavigare sent letters to Hyundai and Kia, addressed to personnel from Hyundai-KR (José Muñoz, President and CEO), Hyundai-US (Jason Erb, Senior Vice President, Chief Legal and Compliance Officer; Doug Bishop, Assistant General Counsel), HCA (Andrea Gildea, General Counsel), Kia-KR (Ho Sung Song, President and CEO), and Kia-US (John Yoon, Chief Legal Officer, General Counsel; Seungkyu (Sean) Yoon, President and CEO), identifying the Asserted Patents as being infringed by Hyundai-Kia products, and further including claim charts demonstrating those infringements.

45. The Accused Products addressed in the Counts below include, but are not limited to, products identified in AutoNavigare's letters to Hyundai-Kia. Hyundai-Kia's past and continuing sales of the Accused Products: (i) willfully infringe the Asserted Patents; and (ii) impermissibly usurp the significant benefits of AutoNavigare's patented technologies without fair compensation.

**THE ASSERTED PATENTS AND TECHNOLOGY**

46. AutoNavigare is the sole and exclusive owner of all right, title, and interest in, and to, the Asserted Patents and holds the exclusive right to take all actions necessary to enforce them, including the filing of this lawsuit and the recovery of damages for all past, present, and future infringements.

***U.S. Patent 7,640,104***

47. The '104 Patent is entitled, "Vehicle Navigation System and Method for Displaying Waypoint Information." The '104 Patent lawfully issued on December 29, 2009 and stems from U.S. Patent Application No. 11/364,119, which was filed on February 27, 2006. A copy of the '104 Patent is attached hereto as Exhibit A.

48. The invention disclosed and claimed by the ’104 Patent relates to technological improvements in how vehicle navigation systems identify and display waypoint information such as restaurants, hotels, or other points of interest (POIs) along a route. *See* Ex. A, Abstract, 1:8-11. At the time of the invention, navigation systems could show POIs but were fundamentally limited: they were “unable to correlate the desired waypoint along the route with the time to reach that waypoint,” nor could they dynamically update waypoint selection based on traffic flow conditions. *See id.*, 1:37-43, 2:18-27. These prior systems likewise did not permit a user to specify meaningful constraints such as a desired time span (e.g., within 5 minutes of noon) or route deviation criteria (e.g., within two miles of the route). *See id.*, 2:18-27, 3:43-50. Because they lacked mechanisms to evaluate waypoints in view of such constraints, earlier navigation systems frequently cluttered map displays with irrelevant POIs. *See id.*, 2:18-27, 6:31-34. Prior systems further did not support two-way communication with waypoint content providers, which prevented the delivery of real-time information such as restaurant availability, promotions, or temporary closures from businesses along a route. *See id.*, 1:44-48, 3:67-4:3, 6:21-34.

49. The ’104 Patent introduces a series of concrete technological improvements to remedy these deficiencies. As described in the specification and flow diagrams, the navigation system allows users to input not only the type of desired waypoint but also the desired time of arrival and the permissible timing or distance deviation. *See id.*, 2:6-27, 3:30-50, 4:56-59, Fig. 3 step 50. For example, Fig. 2 is an exemplary screen display when the user inputs a pizza restaurant waypoint within 5 minutes of noon and no more than 2 miles from the route:




Fig-2

*Id.*, Fig. 2. Using this information, the navigation system's route calculation engine determines the predicted arrival time at candidate waypoints along the route based on real-time traffic information, stochastic traffic modeling, weather data, and other external conditions. *See id.*, 3:51-55; Fig. 3 step 52. The system continuously updates these calculations during travel, refining its waypoint recommendations in response to current vehicle position and evolving traffic conditions. *See id.*, 4:4-23. This iterative and dynamic processing was not performed by prior navigation systems and provides materially more accurate and relevant waypoint guidance. *See id.*

50. A further improvement disclosed by the '104 Patent is its ability to avoid display clutter by selectively presenting only those waypoints that satisfy the user's timing and deviation constraints. *See id.*, 2:18–27, 6:31-34. When no waypoint satisfies those constraints, the system warns the user and may propose an alternate route or recommend substitute waypoints that closely match the desired criteria. *See id.*, 4:24-55. The invention also supports two-way communication with external waypoint content providers, enabling the navigation system to receive timely waypoint-related information and targeted advertising from restaurants, hotels, and other businesses. *See id.*, 1:44-48, 3:67-4:3, 6:21-34. This communication architecture—absent in earlier

navigation devices—allows POI information to be dynamic, current, and contextually relevant.

51. The specification further discloses advanced processor logic for filtering and prioritizing waypoint information based on multiple inputs. For example, the system can extract keywords from speech detected inside the vehicle, RFID data identifying possessions carried by occupants, information from mobile devices such as cell phones, sensor data, and even visual information from a cabin-facing camera. *See id.*, 5:5-61; Fig. 4-5. This information is analyzed by dedicated algorithms to infer occupant preferences and conditions, enabling the system to filter and display waypoint information or advertisements tailored to the occupants' interests. *See id.*, 5:62-6:20. Prior navigation systems did not include such multi-modal data extraction or any framework capable of leveraging these inputs for waypoint selection.

52. The claims of the '104 Patent reflect these technological advances. For example, "displaying information on a vehicle navigation system" of claims 1-16 includes "receiving criteria which identifies desired waypoint(s) along said route" and "selectively displaying received waypoint(s) on the screen which correspond to the desired waypoint(s)." *Id.*, Claims 1, 10. These claim limitations tie directly to the novel system architecture and processing logic disclosed in the specification, which together improve the functioning of vehicle navigation systems.

53. The '104 Patent describes and claims specific, concrete technological improvements to navigation systems—improvements that enable the system to intelligently determine waypoints based on desired arrival times, adapt dynamically to real-time conditions, reduce display clutter, integrate multi-modal user and environmental data, and communicate with external content providers. These innovations were not well-understood, routine, or conventional at the time of the invention and represent meaningful advancements in the field of automotive navigation technology.

***U.S. Patent 7,653,482***

54. The ’482 Patent is entitled, “On-Vehicle Navigation Apparatus and Subject Vehicle Position Correction Method.” The ’482 Patent lawfully issued on January 26, 2010 and stems from U.S. Patent Application No. 11/597,937, which was filed on March 24, 2005 and claims priority to a Japanese Patent Application (JP2004-164744) filed on June 2, 2004. A copy of the ’482 Patent is attached hereto as Exhibit B.

55. The invention disclosed and claimed by the ’482 Patent relates to technological improvements to “an on-vehicle navigation apparatus that indicates the subject vehicle position.” Ex. B, 1:8-9. At the time of the invention, navigation systems primarily relied on GPS and gyro sensors to estimate the vehicle’s position. *See id.*, 1:14-21. However, these systems routinely suffered from a phenomenon known as “position jump,” whereby the system abruptly switched the vehicle position from one road to another, especially near branching points or closely spaced parallel roads. *See id.*, 1:21–32. These abrupt and erroneous position shifts caused user confusion, unreliable guidance, and repeated auto-rerouting events. *See id.*, 1:32-50.

56. The inventor of the ’482 Patent identified these shortcomings and sought to improve upon prior art techniques by incorporating image-based roadway analysis into the navigation system. *See id.*, 2:7-29. To that end, the ’482 Patent describes and claims specific technological improvements to vehicle-position correction, including the use of camera-captured images to detect road marker lines and determine the lane in which the vehicle is traveling. *See id.*, 2:7-3:7, 8:1-40, 10:52-11:9. These improvements allow the navigation system to determine vehicle position between multiple candidate roads and prevent position jump in environments where GPS-only systems were inadequate. *See id.*, 3:11-29.

57. The specification and claims of the ’482 Patent evidence the invention’s technical

improvements. The patent describes a novel combination of: (i) a map matching candidate identifying unit that selects roads based on vehicle position; (ii) a road marker line detection unit that analyzes camera imagery to detect lane boundaries; and (iii) a decision-making unit that determines, based on the detected lane geometry, whether the vehicle is actually traveling on a particular candidate road. *See, e.g., id.*, Abstract. Using these components, the navigation apparatus adjusts the vehicle position only when the system concludes, based on camera-derived lane information, that the vehicle is traveling on the candidate road. *See id.*, 7:8-65; FIG. 4. These aspects of the invention were not well-understood, routine, or conventional at the time of the invention.

58. The specification further discloses a second embodiment that prevents erroneous position correction when the vehicle enters roadside facilities such as parking areas. *See id.*, 9:14-20. In prior systems, if a vehicle turned off the roadway into a nearby lot but remained geographically close to an adjacent road, the map matching algorithm would often have the vehicle's position on the road, creating significant inaccuracies. *See id.*, 9:34-37. The '482 Patent discloses detecting when the vehicle has moved over a road marker line and then stopping map matching corrections until the system determines the vehicle has returned to the roadway. *See id.*, 10:1-51; FIG. 7. This capability, which requires image-based detection of lane-edge transitions, was not performed by prior navigation systems and provides a significant technical improvement in how map matching is executed. *See id.*, 10:52-11:9.

59. The claims of the '482 Patent reflect these technological advances. For example, claim 1 recites an "on-vehicle navigation apparatus" comprising "a subject vehicle position detection unit," "a road marker line detection unit," "a map matching candidate identifying unit," "a decision making unit" configured to determine, based on camera-detected road marker lines,

whether the vehicle is traveling on the identified road, and "a map matching unit" configured to correct the detected position only when the decision making unit determines that the vehicle is traveling on the identified road. *Id.*, Claim 1. Likewise, claim 3 recites a "subject vehicle position correction method" that includes "identifying a road to be designated as a map matching candidate," "making a decision based upon an image captured via a camera as to whether or not the subject vehicle is traveling on the identified road by making a decision as to whether or not the subject vehicle has moved over a road marker line," "correcting the subject vehicle position" when that determination is affirmative, and "stopping correcting the subject vehicle position" when that determination is negative. *Id.*, Claim 3. These limitations tie directly to the technical architecture disclosed in the specification and were not well-understood, routine, or conventional activities at the time of the invention.

60. As described above, the '482 Patent provides a specific technical solution to the problem of unreliable GPS-only vehicle positioning by integrating real-time camera-based detection of lane boundaries and road marker geometry into the vehicle position correction process. As of the priority date of the '482 Patent, navigation devices and technology did not use camera-detected marker line information to determine whether the vehicle was traveling on a specific road, nor did they condition map matching on such determinations. *See, e.g., id.*, 1:14-60. The improvements disclosed and claimed by the '482 Patent enabled navigation devices to achieve more stable, accurate, and reliable map-matching in environments where prior systems routinely failed. *See, e.g., id.*, 2:7-3:7, 8:1-40, 10:52-11:9. In other words, the improvements to vehicle position correction using image-derived roadway information, as set forth by the claims of the '482 Patent, were not well-understood, routine, or conventional activity at the time of the invention.

61. The ’482 Patent describes and claims, among other things, specific technological improvements to navigation systems that improve how such systems detect, verify, and correct vehicle position information through the use of camera-based lane detection and conditional map matching logic. The claims are not directed to an abstract idea. Rather, as evidenced by the patent’s specification and claims, they are drawn to a specific navigation apparatus and method that improve upon prior art navigation systems through techniques that were not well-understood, routine, or conventional at the time of the invention.

***U.S. Patent 7,725,254***

62. The ’254 Patent is entitled, “Navigation Device Used for a Route Search.” The ’254 Patent lawfully issued on May 25, 2010 and stems from U.S. Patent Application No. 11/514,931, which was filed on September 5, 2006 and claims priority to a Japanese Patent Application (JP2005-256485) filed on September 5, 2005. A copy of the ’254 Patent is attached hereto as Exhibit C.

63. The invention disclosed and claimed by the ’254 Patent “relates to a navigation device, and particularly to a route search technique for a car-mounted navigation device.” Ex. C, 1:7-9. Route searching, as used in the ’254 Patent, refers to the implementation of route searching by one or more computer processors using data representing links (segments of road) and associated data that can be used to calculate a cost of traversing a particular link (e.g., distance, speed limit, traffic conditions) to identify one or more preferred routes. At the time of the invention, the data sets used in route searching for road navigation and guidance were complex and contained large quantities of information that could not be meaningfully organized and maintained by pencil and paper, much less a human brain. Likewise, at the time of the invention, the processing required to perform route searching for road navigation and guidance was complex

and required substantial computing power, particularly given the size and complexity of real-world data sets. A human could not perform route searching as contemplated by the ’254 Patent and its claims with pencil and paper in any useful way on any useful data set, much less mentally.

64. The inventors of the ’254 Patent discerned that prior art navigation devices and techniques could be improved by using lane-specific link costs. *See id.*, 1:5-27. To that end, the ’254 Patent describes and claims specific technological improvements to navigation devices to improve route searching by such devices through use of lane-specific costs. The claims of the patent are not directed to an abstract idea or other ineligible subject matter, but instead to technical improvements to navigation devices.

65. The specification and claims of the ’254 Patent evidence the invention’s technical improvements to navigation devices and route searching. The ’254 Patent describes a navigation device that includes a processor configured to provide, among other things, route searching. “[F]or example, Dijkstra’s algorithm for searching for a route connecting the two designated points (i.e. the present location and the destination) so that the cost (such as travel time) of the route becomes smallest.” *Id.*, 5:52-56; *see also id.,* 2:55-61, 6:42-8:60. Notably, the specification explains how lane-specific cost data is used to provide improved route searching and guidance. *See, e.g., id.*, 7:5-8:60.

66. To implement the disclosed invention, the ’254 Patent describes new structures for storing map-related data, including costs associated with lanes of a link (a representation of a road segment), in a memory of a navigation device. As illustrated by the Figures 2-6 (and related disclosure), for example, the patent describes a navigation device with a memory that stores map data organized by links, where each link is associated with respective data, including lane information, and also statistic and cost information for the link, including lane-specific cost

information. *See, e.g., id.*, 3:1-4:31. Specifically, Figures 2, 4 and 5 appear as follows:

FIG. 2




*Id.*, Fig. 2.

FIG. 4




*Id.*, Fig. 4.

FIG. 5

LINK TRAVEL TIME 3225

32251 32252

| LANE | LINK TRAVEL TIME BY LANE |
|---|---|
| RIGHT TURN LANE | ** |
| LEFT TURN LANE | ** |
| STRAIGHT THROUGH LANE | ** |
| ⋮ | ⋮ |

*Id.*, Fig. 5. The disclosed data structures, which (among other things) associate lane-related data with a link as opposed to treating a lane as a separate link, make better use of memory and reduce the complexity of route searching.

67. The claims of the ’254 Patent reflect the novel data structures and route search technology of the disclosed invention. For example, the “navigation device” of claims 1-6 includes “a storage unit configured to store link data for links constituting routes on a map, where at least one link has plural lanes including ones of a left-turn lane, a straight-through lane and a right-turn lane, and where the link data: identifies each link using an identifier, associates each respective lane with the identifier of the at least one link to which it belongs, and stores respective costs of the respective lanes.” *Id.*, 9:64-10:4. These aspects of the claimed invention were not well-understood, routine or conventional at the time of the invention.

68. The prosecution history for the application that issued as the ’254 Patent evidences that a “navigation device” comprising “a storage unit configured to store link data for links constituting routes on a map, where at least one link has plural lanes including ones of a left-turn lane, a straight-through lane and a right-turn lane, and where the link data: identifies each link using an identifier, associates each respective lane with the identifier of the at least one link to which it belongs, and stores respective costs of the respective lanes” was not well-understood, routine, or conventional activity at the time of the invention. During prosecution of the application

that issued as the ’254 Patent (U.S. Patent Application No. 11/514,931), the USPTO rejected the claims as unpatentable in view of prior art. In response, in an Amendment dated October 6, 2009, the applicant amended claim 1 as shown below:

> 1. (Currently Amended) A navigation device, comprising:
>
> ~~a storage means for storing~~ a storage unit configured to store link data for links constituting routes on a map, where at least one link has plural lanes including ones of a left-turn lane, a straight-through lane and a right-turn lane, and where the link data: identifies each link using an identifier, associates each respective lane with the identifier of the at least one link to which it belongs, and stores respective costs of the respective lanes; and ~~including cost of respective lanes of links constituting a road on a map; and~~
>
> ~~a route search means for searching~~ a route search unit adapted to search for a route having a lowest total cost to a destination, using said link data, including using the respective costs of the respective lanes.

Ex. D, p. 3. The applicant argued that the prior art did not disclose or suggest “storing costs with respect to lanes.” *See id.*, pp. 10, 12. Responsive to the October 6, 2009 Amendment, the USPTO allowed the amended claims, evidencing that the elements of the issued claims were not well-understood, routine, or conventional activity at the time of the invention. *See* Ex. E.

69. The improved route searching technology implemented by the disclosed navigation device is also reflected in the claims of the ’254 Patent. For example, claim 1 recites “a route search unit adapted to search for a route having a lowest total cost to a destination, using laid link data, ***including using the respective costs of the respective lanes***.” Ex. C, 10:5-8 (emphasis added); *see also id.*, 10:9-12 (“said route search unit uses, as a cost of a link on a route, a cost of a lane on which a vehicle runs to move to a next link, such being the cost of one of lanes of the link

in question"); *id.*, 10:28-32 ("the route search unit uses, as a cost of a link on a route, a cost of a lane on which a vehicle runs to move to a next link this cost having been classified according to a collection condition corresponding to the situation at the time of arrival at the link in question"). "Said link data" and "the respective costs of the respective lanes" refers to information stored according to the novel data structures disclosed by the '254 Patent and claimed in the "storage unit" limitations of claim 1; thus, the claim language ties how the claimed route search unit searches for a route using the unique data structure of the navigation device disclosed and claimed by the '254 Patent.

70. As explained by the '254 Patent, prior art navigation devices did not account for differences between costs of traveling on different lanes of a link when performing route searching. *See id.*, 1:6-34. In other words, using lane costs to implement route searching in a navigation device, as set forth by the claims of the '254 Patent, was not well-understood, routine, or conventional activity at the time of the invention.

71. The prosecution history for the '254 Patent further evidences that using lane-specific costs to perform route searching was not well-understood, routine, or conventional activity. As discussed above, the claims of the application that issued as the '254 Patent (U.S. Application No. 11/514,931) were amended to recite, in part, "a route search unit adapted to search for a route having a lowest total cost to a destination, using said link data, ***including using the respective costs of the respective lanes***" to overcome prior art rejections. *See* Ex. D, p. 3 (emphasis added to amended language). The USPTO allowed the claims in response to the applicant's amendments, evidencing that the route searching technology claimed by the patent was not well-understood, routine, or conventional at the time of the invention. *See* Ex. E.

72. The '254 Patent describes and claims specific technological improvements to

navigation devices to improve route searching and guidance by such devices through use of, among other things, lane specific costs for route searching. As of the priority date of the ’254 Patent, navigation devices and technology did not account for lane specific costs for lanes of a link when performing route searching. The technology disclosed and claimed by the ’254 Patent enabled navigation devices to provide route searching and guidance in a way that, at the time of the invention, was an unconventional use of navigation and other computing technology. In other words, taking into account lane-specific costs to perform route searching in a navigation device, as set forth by the claims of the ’254 Patent, was not well-understood, routine, or conventional activity at the time of the invention.

73. The ’254 Patent describes and claims, among other things, specific technological improvements to navigation devices to improve route searching by such devices through use of lane-specific costs. The claims are not directed to an abstract idea. Rather, as discussed above and evidenced by the patent’s specification, claims, and file history, the claims are drawn to a specific navigation device that improves upon prior art navigation devices and route searching technology through the use of, among other things, novel data structures and route searching technology, each of which and together, were not well-understood, routine, or conventional at the time of the invention.

***U.S. Patent 8,694,232***

74. The ’232 Patent is entitled, “Method of Predicting Energy Consumption, Apparatus for Predicting Energy Consumption, and Terminal Apparatus.” The ’232 Patent lawfully issued on April 8, 2014 and stems from U.S. Patent Application No. 12/805,846, which was filed on Aug. 20, 2010 and claims priority to a Japanese Patent Application (JP2009-208001) filed on September 9, 2009. A copy of the ’232 Patent is attached hereto as Exhibit F.

75. The invention disclosed and claimed in the ’232 Patent relates to technological improvements in predicting and using vehicular energy consumption information for navigation systems. *See* Ex. F, Abstract, 1:16-20. As explained in the specification, conventional approaches relied either on (1) physical models requiring accurate three-dimensional road geometry and detailed vehicle type parameters, or (2) statistics based on historical probe vehicle data that required large sample sizes for each vehicle type and driving pattern. *See id.*, 1:22-2:2. Both approaches were limited, as they performed poorly when road shape data was inaccurate, when certain vehicle models lacked prior data, or when probe vehicle data was insufficient. *See id.*, 2:8-2:21.

76. The ’232 Patent identifies these shortcomings and discloses specific technical solutions that allow energy consumption predictions to be made reliably, even when probe vehicle samples are sparse or vehicle type diversity is high. *See id.*, 2:8-2:38. The ’232 Patent introduces a navigation architecture in which probe vehicle data including link-level travel time, vehicle type, and measured energy consumption is collected. *See id.*, 3:36-52, 4:20-28, FIGS. 1-2. Using this collected data, the system calculates geographic characteristic values for each road link, i.e., values that reflect the energy-related attributes of the roadway itself (e.g., slope, friction, undulation) that are independent of vehicle type and driving pattern. *See id.*, 4:47-53, 10:56-11:21, 19:25-36, FIG. 9.

77. The specification teaches, in detail, how the system removes vehicle specific and driver specific effects from the probe data. *See id.*, 8:15-14:67, FIGS. 7-8. Using a combination of road map information, vehicle type parameters, and a mathematically defined driving pattern model, the system isolates the portion of energy consumption attributable solely to the geography of the link. *See id.*, 8:32-50. These link specific constants include components corresponding to

acceleration/deceleration, velocity, congestion, and regenerative effects (for electric vehicles). *See id.*, 8:60-65, 11:48-55.

78. These geographic characteristic values are then used by the system to compute predicted energy consumption for any vehicle type, even one for which no historical probe data exists. *See id.*, 15:1-16:42, FIG. 11. As the patent explains, once the geographic characteristic values are calculated for a link, the navigation server (or navigation terminal, in the second embodiment) combines them with predicted travel times and a vehicle's specific parameters to generate a per-link predicted energy cost. *See id.*, 15:1-16:42, 19:50-57, FIG. 11.

79. The '232 Patent further discloses how navigation terminals use these predicted energy consumptions, including predicted travel times, to perform route searches that minimize energy usage. *See id.*, 16:55-18:40, FIG. 13. The system applies these predicted per-link costs in a standard minimum cost routing algorithm to provide drivers routes that minimize total energy expenditure. *See id.*, 17:18-29. The patent illustrates example map displays presenting users with comparisons, e.g., among the lowest energy route, the shortest time route, and the shortest distance route. *See id.*, 17:38-58, 18:22-30, FIGS. 14-15.

80. In a second embodiment, the patent describes a distributed architecture where geographic characteristic values are periodically delivered to navigation terminals, enabling terminals to perform energy-consumption prediction locally without needing continuous server communication. *See id.*, 19:48-24:62; FIGS. 16-20. This further demonstrates that the patent is directed to concrete technological improvements in navigation systems because the embodiments teach specific data structures, algorithms, and system-level designs for efficient and accurate energy-prediction computation.

81. The claims of the '232 Patent reflect these technological advancements. For

example, claim 1 recites specific components and steps performed in a "method of predicting energy consumption," including "calculating geographic characteristic values" from probe vehicle data, "receiving a prediction energy consumption request" including a vehicle type, "calculating a predicted energy consumption" for each link based on the geographic characteristic values, and "delivering each predicted energy consumption" to a terminal, which in turn "output[s] route guide information." *Id.*, Claim 1. These claim requirements were not well-understood, routine, or conventional. They embody a technological solution to an identified deficiency in prior navigation systems that lack an accurate, scalable mechanism for predicting energy consumption across diverse vehicle types in varying road conditions.

82. In sum, the '232 Patent describes and claims specific, non-conventional technical improvements to navigation systems by isolating link-specific geographic energy consumption characteristics and using them to generate accurate, vehicle-specific energy consumption predictions for route planning. At the time of the invention, navigation systems did not extract geography-only energy-influence parameters from noisy probe vehicle data, nor did they use such values to perform link-level energy optimized routing. The '232 Patent provides a technical solution to these problems and is directed to patent eligible technological improvements, not abstract ideas.

***U.S. Patent 8,886,398***

83. The '398 Patent is entitled, "In-Car Information System, In-Car Device, and Information Terminal." The '398 Patent lawfully issued on November 11, 2014 from U.S. Patent Application No. 13/824,150, filed on September 16, 2011, which is the U.S. national stage of PCT Application No. PCT/JP2011/071242. The '398 Patent claims priority to three Japanese Patent Applications: JP2010-209333 (filed September 17, 2010), JP2010-251664 (filed November 10,

2010), and JP2011-090411 (filed April 14, 2011). A copy of the ’398 Patent is attached hereto as Exhibit G.

84. The ’398 Patent describes and claims a novel in-car information system that enables an information terminal (e.g., a smartphone) and an in-car device (e.g., an infotainment system) to cooperate in assigning operations to vehicle actuations, such as steering wheel buttons, dashboard buttons, knobs, or other vehicle input devices, that are otherwise performed by applications executing on the information terminal. Rather than relying upon fixed mappings between vehicle controls and smartphone functions, the disclosed invention dynamically assigns operations to available vehicle actuations based on operation assignment information, the capabilities of the connected in-car device, and priority levels associated with the operations. The claims are not directed to an abstract idea or other ineligible subject matter, but instead to specific systems and devices that improve interoperability between an information terminal and an in-car device through a particular technological mechanism for assigning and converting vehicle actuations into operating commands.

85. The claims of the ’398 Patent reflect the novel technological improvements of the disclosed invention. For example, independent claim 1 recites specific technological devices—an “information terminal” and “in-car device”—not an abstract idea or other ineligible subject matter. The claimed information terminal includes an operation assignment information storage unit, an actuation information reception unit, an assignment unit, an actuation signal reception unit, and a conversion unit, each configured to perform specific technological functions. *See* Ex. G, 69:36-65. In particular, the claim recites that the assignment unit assigns operations of the information terminal to one or more vehicle actuations “according to priority levels” based on operation assignment information and actuation information received from the in-car device, and that the

conversion unit converts received actuation signals into operating commands corresponding to the assigned operations. *Id.* The claimed in-car device includes an actuation information transmission unit for transmitting actuation information and an actuation signal output unit for outputting the actuation signal to the information terminal. *Id.* Thus, the claim recites a specific technological architecture for dynamically mapping vehicle controls to operations of a connected information terminal and converting user actuations into application-specific operating commands. This was not well-understood, routine, or conventional activity at the time of the invention.

86. The remaining claims of the '398 Patent further recite specific technological improvements to in-car information systems. For example, dependent claims require the use of recommended classifications for vehicle actuations, the transmission of actuation correspondence information identifying assigned operations, the display of icons corresponding to assigned operations on predetermined portions of a display monitor, and restrictions on available operations while the vehicle is in motion. *See id.*, 69:66-70:61. These limitations further narrow the claims to specific technological implementations for coordinating operation assignment between an information terminal and an in-car device, thereby improving the usability, flexibility, and safety of smartphone integration with vehicle control systems.

87. The '398 Patent therefore describes and claims specific technological improvements to systems in which an information terminal (e.g., a smartphone) interoperates with an in-car device (e.g., an infotainment system). Through the use of operation assignment information, dynamic assignment of operations to vehicle actuations according to priority levels, and conversion of vehicle actuation signals into operating commands corresponding to assigned operations, the claimed inventions improve the operation of in-car information systems and address shortcomings in prior systems that relied upon fixed or inflexible control mappings. *See*

*id.*, 1:43-2:33, 10:54-61. The claims are not directed to an abstract idea, but instead to specific technical systems and devices configured to operate in ways that were not well-understood, routine, or conventional at the time of the invention.

***U.S. Patent 9,766,801***

88. The ’801 Patent is entitled, “In-Car Information System, In-Car Device, and Information Terminal.” The ’801 Patent lawfully issued on September 19, 2017 and stems from U.S. Patent Application No. 15/018,060, which was filed on February 8, 2016, and is a continuation of U.S. Patent Application No. 14/508,420, which was filed on October 7, 2014, itself a continuation of U.S. Patent Application No. 13/824,150 filed on September 16, 2011. The ’801 Patent claims priority to three Japanese Patent Applications: JP2010-20933 (filed September 17, 2010), JP2010-251664 (filed November 10, 2010), and JP2011-090411 (filed April 14, 2011). A copy of the ’801 Patent is attached hereto as Exhibit H.

89. The ’801 Patent describes and claims a novel interface that allows an information terminal and in-car device to establish communications, exchange functionality and configuration parameters, and generate information used to produce a menu that is displayed by the in-car device and used to control the execution and use of applications on the information terminal. The claims of the patent are not directed to an abstract idea or other ineligible subject matter, but instead to specific systems and devices that incorporate a technical solution to problems arising in systems wherein an in-car device (e.g., infotainment system) is used to control the execution or use of applications on an information terminal (e.g., a smartphone).

90. The claims of the ’801 Patent reflect the novel technological improvements of the disclosed invention. Claim 1 recites a specific technological system—“An in-car information system comprising an in-car device and an information terminal”—not an abstract idea or any

other ineligible subject matter. The claim recites limitations that narrowly tailor the claimed "in-car device" and "information terminal" to specific hardware configured to operate together in a particular way. *See* Ex. H, 71:36-72:11. Notably, the claimed "information terminal" includes, among other things, "an application manager," which corresponds to the novel "SPMan" disclosed by the '801 Patent. Claim 1 recites "the information terminal starts the application manager to transmit, from the video signal output unit to the in-car device, the video signal for displaying a menu screen on the in-car device display monitor when the information terminal receives the start command from the in-car device" and "the in-car device receives the video signal by the video signal input unit to display the menu screen on the in-car device display monitor on the basis of the received video signal." *Id.*, 72:1-11. Thus, the claim recites an in-car system in which a specifically claimed information terminal (e.g., smartphone) executes an application manager to transmit a video signal for displaying a menu screen on a specifically claimed in-car device (e.g., infotainment system). This was not well-understood, routine, or conventional activity at the time of the invention, as evidenced (for example) by the prosecution history of the application that issued as the '801 Patent. *See* Ex. I, p. 2.

91. Claims 2 through 5 also recite a specific technological device—"An in-car device that is capable to be connected to an information terminal"—not an abstract idea or other ineligible subject matter. Like the system of claim 1, the "in-car device" of claims 2-5 includes specific hardware and is configured to operate in ways that were not well-understood, routine, or conventional activity at the time of the invention. The claimed in-car device includes "a display monitor of a touch panel type," "an interface unit that transmits actuation information on the basis of actuation on the display monitor," and "a video signal input unit that receives a video signal transmitted from the information terminal." Ex. H, 72:12-32. As evidenced by the prosecution

history (for example), the "in-car device" of claims 2 through 5 is configured to operate in ways that were not well-understood, routine, or conventional at the time of the invention. For example, claim 2 recites that the in-car device is configured to "become ready to transmit a start command for an application stored in the information terminal to the information terminal when the interface unit and the video signal input unit are connected to the information terminal." *See, e.g., id.*, 72:19-23. Other claims require that the in-car device interacts with an "application manager" on an information terminal, activity that was not well-understood, routine, or conventional at the time of the invention. *See, e.g., id.*, 72:24-39.

92. Claims 6 and 7 of the '801 Patent are directed to a method for use in a specific technological system—"an in-car information system comprising an information terminal and an in-car device"—that addresses technical shortcomings in the prior art. The claimed "in-car device" is limited to specific configurations (i.e., "the in-car device includes: a display monitor of a touch type; an interface unit that transmits actuation information on the basis of actuation on the display monitor; and a video signal input unit that receives a video signal transmitted from the information terminal"). *Id.*, 72:50-55. The claim also recites that the claimed "in-car information system" performs the steps of, among others, "receiving the video signal for displaying a menu screen by the video signal input unit from the information terminal" and "displaying the menu screen on the display monitor on the basis of the received video signal." *Id.*, 72:56-67. Thus, the claims recite an in-car system in which a specifically-claimed in-car device (e.g., infotainment system) receives a video signal for displaying a menu screen from an information terminal (e.g., smartphone). This was not well-understood, routine, or conventional activity at the time of the invention, as evidenced (for example) by the prosecution history of the application that issued as the '801 Patent. *See* Ex. I.

93. The ’801 Patent describes and claims specific technological improvements to systems in which an in-car device (e.g., infotainment system) is used to interface with and control the operation of an information terminal (e.g., smartphone), including through the use of, among other things, a novel interface that facilitates interoperability between the in-car device and information terminal and generates information that can be used by the in-car device to produce and display a menu for controlling the execution of applications by an information terminal. The claims are not directed to an abstract idea, but instead to specific technical systems and devices configured to operate in ways that were not well-understood, routine, or conventional at the time of the invention to address shortcomings in the prior art.

***Summary***

94. The claims of the Asserted Patents are directed to patent-eligible subject matter under 35 U.S.C. § 101. They are not directed to abstract ideas, and the technologies covered by the claims comprise systems and/or ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

95. AutoNavigare’s claims do not have damages limited by 35 U.S.C. § 287. AutoNavigare seeks damages only for infringement of: (i) method claims of the ’482 Patent; and (ii) claims of the ’104, ’254, ’232, ’398, and ’801 Patents accruing upon, and after, notice of infringement to Hyundai-Kia.

**COUNT I**

(INFRINGEMENT OF U.S. PATENT NO. 7,640,104)

96. AutoNavigare incorporates the preceding paragraphs herein by reference.

97. This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

98. AutoNavigare is the owner of all substantial rights, title, and interest in and to the

’104 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

99. The ’104 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on December 29, 2009, after full and fair examination.

100. Attached hereto as Exhibits J and K, and incorporated herein by reference, are exemplary claim mappings that detail how Hyundai-Kia infringes claim 1 of the ’104 Patent.[6]

***Direct Infringement (35 U.S.C. § 271(a))***

101. Hyundai-Kia has directly infringed and continues to directly infringe one or more claims of the ’104 Patent in this District and elsewhere in Texas and the United States.

102. To this end, Hyundai-Kia directly infringes, either by itself or via its agent(s), at least claim 1 of the ’104 Patent by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Hyundai/Kia/Genesis-branded vehicles equipped with built-in navigation systems that incorporate the fundamental technologies covered by the ’104 Patent, including, but not limited to, Hyundai/Kia/Genesis-branded vehicles equipped with Hyundai-Kia’s Infotainment/Navigation System (including Gen5, Gen5W, Gen6, Connected Car Navigation Cockpit (ccNC), and Connected Car Integrated Cockpit (ccIC) versions) having built-in navigation capabilities (collectively, the “’104 Accused Products”), as illustrated, e.g., in Exhibits J and K.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

103. In addition and/or in the alternative to its direct infringements, Hyundai-Kia has indirectly infringed and continues to indirectly infringe one or more claims of the ’104 Patent by

[6] The claim charts attached hereto as Exhibits J and K are exemplary and should not be interpreted as limiting AutoNavigare’s infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the ’104 Patent.

104. At a minimum, Hyundai-Kia has knowledge of the ’104 Patent since at least service of this Complaint in this action. Hyundai-Kia also has knowledge of the ’104 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of this Complaint, alerting Hyundai-Kia to its infringements. Since receiving notice of its infringements, Hyundai-Kia has actively induced, and continues to actively induce, the direct infringements of its retail partners, dealerships, customers, and/or other end users (e.g., as illustrated by Exhibits J and K) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’104 Patent. Indeed, Hyundai-Kia has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the ’104 Accused Products, including marketing materials, user manuals (e.g., those available via https://ownersmanual.hyundai.com/ and https://ownersmanual.kia.com/), and online instructional materials (e.g., those available via https://www.youtube.com/@HyundaiWorldwide and https://www.youtube.com/@KiaWorldwideOfficial) that specifically teach and encourage customers and other end users to use the ’104 Accused Products in an infringing manner. Affirmative steps to induce infringement further include providing captive financing, leasing, dealer-inventory financing, customer financing, account servicing, and remarketing support that specifically facilitate, enable, and encourage vehicle transactions involving the ’104 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire

the ’104 Accused Products. *See, e.g.*, https://www.hyundaicapitalamerica.com/InvestorRelations.html (HCA “servicing approximately 2.7 million customers and 1,800 dealers across the U.S.”). By providing such instructions, financing, and support, Hyundai-Kia knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’104 Patent.

***Damages***

105. AutoNavigare has been damaged by Hyundai-Kia’s infringing conduct described in this Count. Hyundai-Kia is, thus, liable to AutoNavigare in an amount that adequately compensates it for Hyundai-Kia’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

106. On information and belief, despite having knowledge of the ’104 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’104 Patent, Hyundai-Kia has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Hyundai-Kia’s infringing activities relative to the ’104 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare’s rights with respect to the ’104 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT II

(INFRINGEMENT OF U.S. PATENT NO. 7,653,482)

107. AutoNavigare incorporates the preceding paragraphs herein by reference.

108. This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

109. AutoNavigare is the owner of all substantial rights, title, and interest in and to the ’482 Patent, including the right to exclude others and to enforce, sue, and recover damages for past

infringements.

110. The ’482 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on January 26, 2010, after full and fair examination.

111. Attached hereto as Exhibits L and M, and incorporated herein by reference, are exemplary claim mappings that detail how Hyundai-Kia infringes claim 3 of the ’482 Patent.[7]

***Direct Infringement (35 U.S.C. § 271(a))***

112. Hyundai-Kia has directly infringed and continues to directly infringe one or more claims of the ’482 Patent in this District and elsewhere in Texas and the United States.

113. To this end, Hyundai-Kia directly infringes, either by itself or via its agent(s), at least claim 3 of the ’482 Patent by, among other things, using (including through testing or demonstration) Hyundai/Kia/Genesis-branded vehicles equipped with built-in navigation systems that incorporate the fundamental technologies covered by the ’482 Patent, including, but not limited to, Hyundai/Kia/Genesis-branded vehicles equipped with Hyundai-Kia’s Infotainment/Navigation System (including Gen5, Gen5W, Gen6, Connected Car Navigation Cockpit (ccNC), and Connected Car Integrated Cockpit (ccIC) versions) having Highway Driving Assist (HDA) functionality (collectively, the "’482 Accused Products"), as illustrated, e.g., by Exhibits L and M. In addition, on information and belief, Hyundai-Kia retains title to, and ownership and control over, ’482 Accused Products in vehicles that it leases to customers and other end users and is, thus, liable for infringements performed by the vehicles.

114. Additionally and/or in the alternative, Hyundai-Kia directly infringes, either by itself or via its agent(s), at least claim 3 of the ’482 Patent by directing, controlling, and setting

[7] The claim charts attached hereto as Exhibits L and M are exemplary and should not be interpreted as limiting AutoNavigare’s infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

into operation the performance of the claimed methods of the ’482 Patent (as illustrated, e.g., in Exhibits L and M). Hyundai-Kia directs and controls the ’482 Accused Products’ performance of the steps of the claimed method(s), as Hyundai-Kia provides software that is not accessible to end users and automatically performs the steps of the claimed methods through normal operation of the infotainment system without user action. Further, Hyundai-Kia conditions receipt of various benefits upon performance of the patented methods (e.g., by providing end users seamless integration of key infotainment system functionality consistent with their expectations, as well as by providing manufacturer warranties conditioned upon operation of the vehicle without alteration). In addition, Hyundai-Kia conditions use of its infotainment services and software on acceptance of a Hyundai/Kia/Genesis End User License Agreement that prohibits end users from modifying the services and software. Thus, Hyundai-Kia conditions use of its infotainment system on allowing Hyundai-Kia to implement functionality that performs methods claimed by the ’482 Patent. As discussed above, Hyundai-Kia does more than merely sell a product with software that performs the claimed methods; rather, Hyundai-Kia exercises control over the equipment and software that performs the method set forth in at least claim 3 of the ’482 Patent.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

115. In addition and/or in the alternative to its direct infringements, Hyundai-Kia has indirectly infringed and continues to indirectly infringe one or more claims of the ’482 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the ’482 Patent.

116. At a minimum, Hyundai-Kia has knowledge of the ’482 Patent since at least service of this Complaint in this action. Hyundai-Kia also has knowledge of the ’482 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of this Complaint, alerting Hyundai-

Kia to its infringements. Since receiving notice of its infringements, Hyundai-Kia has actively induced, and continues to actively induce, the direct infringements of its retail partners, dealerships, customers, and/or other end users (e.g., as illustrated by Exhibits L and M) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’482 Patent. Indeed, Hyundai-Kia has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the ’482 Accused Products, including marketing materials, user manuals (e.g., those available via https://ownersmanual.hyundai.com/ and https://ownersmanual.kia.com/), and online instructional materials (e.g., those available via https://www.youtube.com/@HyundaiWorldwide and https://www.youtube.com/@KiaWorldwideOfficial) that specifically teach and encourage customers and other end users to use the ’482 Accused Products in an infringing manner. Affirmative steps to induce infringement further include providing captive financing, leasing, dealer-inventory financing, customer financing, account servicing, and remarketing support that specifically facilitate, enable, and encourage vehicle transactions involving the ’482 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’482 Accused Products. *See, e.g.*, https://www.hyundaicapitalamerica.com/InvestorRelations.html (HCA “servicing approximately 2.7 million customers and 1,800 dealers across the U.S.”). By providing such instructions, financing, and support, Hyundai-Kia knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of

the ’482 Patent.

***Damages***

117. AutoNavigare has been damaged by Hyundai-Kia’s infringing conduct described in this Count. Hyundai-Kia is, thus, liable to AutoNavigare in an amount that adequately compensates it for Hyundai-Kia’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

118. On information and belief, despite having knowledge of the ’482 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’482 Patent, Hyundai-Kia has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Hyundai-Kia’s infringing activities relative to the ’482 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare’s rights with respect to the ’482 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT III**

(INFRINGEMENT OF U.S. PATENT NO. 7,725,254)

119. AutoNavigare incorporates the preceding paragraphs herein by reference.

120. This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

121. AutoNavigare is the owner of all substantial rights, title, and interest in and to the ’254 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

122. The ’254 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on May 25, 2010, after full and fair examination.

123. Attached hereto as Exhibits N and O, and incorporated herein by reference, are

exemplary claim mappings that detail how Hyundai-Kia infringes claim 1 of the ’254 Patent.[8]

***Direct Infringement (35 U.S.C. § 271(a))***

124. Hyundai-Kia has directly infringed and continues to directly infringe one or more claims of the ’254 Patent in this District and elsewhere in Texas and the United States.

125. To this end, Hyundai-Kia directly infringes, either by itself or via its agent(s), at least claim 1 of the ’254 Patent as set forth under 35 U.S.C. § 271(a) by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Hyundai/Kia/Genesis-branded vehicles equipped with built-in navigation systems that incorporate the fundamental technologies covered by the ’254 Patent, including, but not limited to, Hyundai/Kia/Genesis-branded vehicles equipped with Hyundai-Kia’s Infotainment/Navigation System (including Gen5, Gen5W, Gen6, Connected Car Navigation Cockpit (ccNC), and Connected Car Integrated Cockpit (ccIC) versions) having built-in navigation capabilities (collectively, the “’254 Accused Products”), as illustrated, e.g., by Exhibits N and O.

126. Hyundai-Kia also directly infringes the ’254 Patent by using (including through testing or demonstrating) route searching features of the ’254 Accused Products, which puts the claimed system into service because it initiates at the ’254 Accused Product a demand for searching routes and benefits from the back end providing that service.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

127. In addition and/or in the alternative to its direct infringements, Hyundai-Kia has indirectly infringed and continues to indirectly infringe one or more claims of the ’254 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to

[8] The claim charts attached hereto as Exhibits N and O are exemplary and should not be interpreted as limiting AutoNavigare’s infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

directly infringe the ’254 Patent.

128. At a minimum, Hyundai-Kia has knowledge of the ’254 Patent since at least service of this Complaint in this action. Hyundai-Kia also has knowledge of the ’254 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of this Complaint, alerting Hyundai-Kia to its infringements. Since receiving notice of its infringements, Hyundai-Kia has actively induced, and continues to actively induce, the direct infringements of its retail partners, dealerships, customers, and/or other end users (e.g., as illustrated by Exhibits N and O) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’254 Patent. Indeed, Hyundai-Kia has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the ’254 Accused Products, including marketing materials, user manuals (e.g., those available via https://ownersmanual.hyundai.com/ and https://ownersmanual.kia.com/), and online instructional materials (e.g., those available via https://www.youtube.com/@HyundaiWorldwide and https://www.youtube.com/@KiaWorldwideOfficial) that specifically teach and encourage customers and other end users to use the ’254 Accused Products in an infringing manner. Affirmative steps to induce infringement further include providing captive financing, leasing, dealer-inventory financing, customer financing, account servicing, and remarketing support that specifically facilitate, enable, and encourage vehicle transactions involving the ’254 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’254 Accused Products. *See, e.g.*,

https://www.hyundaicapitalamerica.com/InvestorRelations.html (HCA "servicing approximately 2.7 million customers and 1,800 dealers across the U.S."). By providing such instructions, financing, and support, Hyundai-Kia knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the '254 Patent. Furthermore, the '254 Accused Products initiate a demand for searching routes and benefits from the back end providing that service.

***Damages***

129. AutoNavigare has been damaged by Hyundai-Kia's infringing conduct described in this Count. Hyundai-Kia is, thus, liable to AutoNavigare in an amount that adequately compensates it for Hyundai-Kia's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

130. On information and belief, despite having knowledge of the '254 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the '254 Patent, Hyundai-Kia has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Hyundai-Kia's infringing activities relative to the '254 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare's rights with respect to the '254 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT IV

(INFRINGEMENT OF U.S. PATENT NO. 8,694,232)

131. AutoNavigare incorporates the preceding paragraphs herein by reference.

132. This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

133. AutoNavigare is the owner of all substantial rights, title, and interest in and to the '232 Patent, including the right to exclude others and to enforce, sue, and recover damages for past

infringements.

134. The ’232 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on April 8, 2014, after full and fair examination.

135. Attached hereto as Exhibits P and Q, and incorporated herein by reference, are exemplary claim mappings that detail how Hyundai-Kia infringes claim 1 of the ’232 Patent.[9]

***Direct Infringement (35 U.S.C. § 271(a))***

136. Hyundai-Kia has directly infringed and continues to directly infringe one or more claims of the ’232 Patent in this District and elsewhere in Texas and the United States.

137. To this end, Hyundai-Kia directly infringes, either by itself or via its agent(s), at least claim 1 of the ’232 Patent by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Hyundai/Kia/Genesis-branded vehicles equipped with built-in navigation systems that incorporate the technologies covered by the ’232 Patent, including, but not limited to, Hyundai/Kia/Genesis-branded vehicles equipped with Hyundai-Kia’s Infotainment/Navigation System (including Gen5, Gen5W, Gen6, Connected Car Navigation Cockpit (ccNC), and Connected Car Integrated Cockpit (ccIC) versions) having built-in navigation capabilities that support predicting energy consumption (collectively, the “’232 Accused Products”), as illustrated, e.g., by Exhibits P and Q.

138. Hyundai-Kia also directly infringes the ’232 Patent by using (including through testing or demonstrating) energy consumption prediction features of the ’232 Accused Products, which puts the claimed system into service because it initiates at the ’232 Accused Product a demand for predicting energy consumption and benefits from the back end providing that service.

[9] The claim charts attached hereto as Exhibits P and Q are exemplary and should not be interpreted as limiting AutoNavigare’s infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

139. In addition and/or in the alternative to its direct infringements, Hyundai-Kia has indirectly infringed and continues to indirectly infringe one or more claims of the ’232 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the ’232 Patent.

140. At a minimum, Hyundai-Kia has knowledge of the ’232 Patent since at least service of this Complaint in this action. Hyundai-Kia also has knowledge of the ’232 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of this Complaint, alerting Hyundai-Kia to its infringements. Since receiving notice of its infringements, Hyundai-Kia has actively induced, and continues to actively induce, the direct infringements of its retail partners, dealerships, customers, and/or other end users (e.g., as illustrated by Exhibits P and Q) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the ’232 Patent. Indeed, Hyundai-Kia has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the ’232 Accused Products, including marketing materials, user manuals (e.g., those available via https://ownersmanual.hyundai.com/ and https://ownersmanual.kia.com/), and online instructional materials (e.g., those available via https://www.youtube.com/@HyundaiWorldwide and https://www.youtube.com/@KiaWorldwideOfficial) that specifically teach and encourage customers and other end users to use the ’232 Accused Products in an infringing manner. Affirmative steps to induce infringement further include providing captive financing, leasing, dealer-inventory financing, customer financing, account servicing, and remarketing support that

specifically facilitate, enable, and encourage vehicle transactions involving the ’232 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’232 Accused Products. *See, e.g.*, https://www.hyundaicapitalamerica.com/InvestorRelations.html (HCA “servicing approximately 2.7 million customers and 1,800 dealers across the U.S.”). By providing such instructions, financing, and support, Hyundai-Kia knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’232 Patent. Furthermore, the ’232 Accused Products initiate a demand for predicting energy consumption and benefits from the back end providing that service.

***Damages***

141. AutoNavigare has been damaged by Hyundai-Kia’s infringing conduct described in this Count. Hyundai-Kia is, thus, liable to AutoNavigare in an amount that adequately compensates it for Hyundai-Kia’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

142. On information and belief, despite having knowledge of the ’232 Patent and knowledge that it directly and/or indirectly infringes one or more claims of the ’232 Patent, Hyundai-Kia has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Hyundai-Kia’s infringing activities relative to the ’232 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare’s rights with respect to the ’232 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT V**

(INFRINGEMENT OF U.S. PATENT NO. 8,886,398)

143. AutoNavigare incorporates the preceding paragraphs herein by reference.

144. This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

145. AutoNavigare is the owner of all substantial rights, title, and interest in and to the ’398 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

146. The ’398 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on November 11, 2014, after full and fair examination.

147. Attached hereto as Exhibits R and S, and incorporated herein by reference, are exemplary claim mappings that detail how Hyundai-Kia infringes claim 1 of the ’398 Patent.[10]

***Direct Infringement (35 U.S.C. § 271(a))***

148. Hyundai-Kia has directly infringed and continues to directly infringe one or more claims of the ’398 Patent in this District and elsewhere in Texas and the United States.

149. To this end, Hyundai-Kia directly infringes, either by itself or via its agent(s), at least claim 1 of the ’398 Patent as set forth under 35 U.S.C. § 271(a) by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Hyundai/Kia/Genesis-branded vehicles equipped with infotainment systems that incorporate the fundamental technologies covered by the ’398 Patent, including, but not limited to, Hyundai/Kia/Genesis-branded vehicles equipped with infotainment systems that support the integration of portable devices (e.g., smartphones) with the infotainment systems through a wired connection (e.g., via a USB data interface) and/or wirelessly (e.g., via Bluetooth) and capable of dynamic assignment of portable device operations to vehicle buttons such as Hyundai-Kia’s Infotainment System

[10] The claim charts attached hereto as Exhibits R and S are exemplary and should not be interpreted as limiting AutoNavigare’s infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

(including Gen5, Gen5W, Gen6, Connected Car Navigation Cockpit (ccNC), and Connected Car Integrated Cockpit (ccIC) versions) (collectively, the "'398 Accused Products"), as illustrated, e.g., by Exhibits R and S.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

150. In addition and/or in the alternative to its direct infringements, Hyundai-Kia has indirectly infringed and continues to indirectly infringe one or more claims of the '398 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the '398 Patent.

151. At a minimum, Hyundai-Kia has knowledge of the '398 Patent since at least being served with this Complaint in this action. Hyundai-Kia also has knowledge of the '398 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of this Complaint, alerting Hyundai-Kia to its infringements. Since receiving notice of its infringements, Hyundai-Kia has actively induced, and continues to actively induce, the direct infringements of its retail partners, dealerships, customers, and/or other end users (e.g., as illustrated by Exhibits R and S) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '398 Patent. Indeed, Hyundai-Kia has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the '398 Accused Products, including marketing materials, user manuals (e.g., those available via https://ownersmanual.hyundai.com/ and https://ownersmanual.kia.com/), and online instructional materials (e.g., those available via https://www.youtube.com/@HyundaiWorldwide and https://www.youtube.com/@KiaWorldwideOfficial) that specifically teach and encourage

customers and other end users to use the ’398 Accused Products in an infringing manner. Affirmative steps to induce infringement further include providing captive financing, leasing, dealer-inventory financing, customer financing, account servicing, and remarketing support that specifically facilitate, enable, and encourage vehicle transactions involving the ’398 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’398 Accused Products. *See, e.g.*, https://www.hyundaicapitalamerica.com/InvestorRelations.html (HCA “servicing approximately 2.7 million customers and 1,800 dealers across the U.S.”). By providing such instructions, financing, and support, Hyundai-Kia knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’398 Patent.

***Damages***

152. AutoNavigare has been damaged by Hyundai-Kia’s infringing conduct described in this Count. Hyundai-Kia is, thus, liable to AutoNavigare in an amount that adequately compensates it for Hyundai-Kia’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

153. On information and belief, despite having knowledge of the ’398 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the ’398 Patent, Hyundai-Kia has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Hyundai-Kia’s infringing activities relative to the ’398 Patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare’s rights with respect to the ’398 Patent, justifying enhanced damages under 35 U.S.C. § 284.

**COUNT VI**

(INFRINGEMENT OF U.S. PATENT NO. 9,766,801)

154. AutoNavigare incorporates the preceding paragraphs herein by reference.

155. This cause of action arises under the patent laws of the United States and, in particular, 35 U.S.C. §§ 271, *et seq*.

156. AutoNavigare is the owner of all substantial rights, title, and interest in and to the ’801 Patent, including the right to exclude others and to enforce, sue, and recover damages for past infringements.

157. The ’801 Patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on September 19, 2017, after full and fair examination.

158. Attached hereto as Exhibits T and U, and incorporated herein by reference, are exemplary claim mappings that detail how Hyundai-Kia infringes claim 2 of the ’801 Patent.[11]

***Direct Infringement (35 U.S.C. § 271(a))***

159. Hyundai-Kia has directly infringed and continues to directly infringe one or more claims of the ’801 Patent in this District and elsewhere in Texas and the United States.

160. To this end, Hyundai-Kia directly infringes, either by itself or via its agent(s), at least claim 2 of the ’801 Patent as set forth under 35 U.S.C. § 271(a) by making, using (including through testing or demonstration), offering to sell, selling, and/or importing Hyundai/Kia/Genesis-branded vehicles equipped with infotainment systems that incorporate the fundamental technologies covered by the ’801 Patent, including, but not limited to, Hyundai/Kia/Genesis-branded vehicles equipped with touchscreen infotainment systems that support the integration of

[11] The claim charts attached hereto as Exhibits T and U are exemplary and should not be interpreted as limiting AutoNavigare’s infringement theories or be considered an admission that any claim is representative, whether for purposes of determining subject matter eligibility or any other issue.

multimedia devices (e.g., smartphones) with the infotainment systems through a wired connection (e.g., via a USB data interface) and/or wirelessly (e.g., via Bluetooth) such as Hyundai-Kia's Infotainment System (including Gen5, Gen5W, Gen6, Connected Car Navigation Cockpit (ccNC), and Connected Car Integrated Cockpit (ccIC) versions) (collectively, the "'801 Accused Products"), as illustrated, e.g., by Exhibits T and U.

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

161. In addition and/or in the alternative to its direct infringements, Hyundai-Kia has indirectly infringed and continues to indirectly infringe one or more claims of the '801 Patent by knowingly and intentionally inducing others, including its customers and/or other end users, to directly infringe the '801 Patent.

162. At a minimum, Hyundai-Kia has knowledge of the '801 Patent since at least being served with this Complaint in this action. Hyundai-Kia also has knowledge of the '801 Patent since receiving detailed correspondence from AutoNavigare prior to the filing of this Complaint, alerting Hyundai-Kia to its infringements. Since receiving notice of its infringements, Hyundai-Kia has actively induced, and continues to actively induce, the direct infringements of its retail partners, dealerships, customers, and/or other end users (e.g., as illustrated by Exhibits T and U) as set forth under 35 U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '801 Patent. Indeed, Hyundai-Kia has intended to cause, continues to intend to cause, and has taken, and continues to take, affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the '801 Accused Products, including marketing materials, user manuals (e.g., those available via https://ownersmanual.hyundai.com/ and https://ownersmanual.kia.com/), and online instructional

materials (e.g., those available via https://www.youtube.com/@HyundaiWorldwide and https://www.youtube.com/@KiaWorldwideOfficial) that specifically teach and encourage customers and other end users to use the ’801 Accused Products in an infringing manner. Affirmative steps to induce infringement further include providing captive financing, leasing, dealer-inventory financing, customer financing, account servicing, and remarketing support that specifically facilitate, enable, and encourage vehicle transactions involving the ’801 Accused Products, including transactions by retail partners, dealerships, customers, lessees, and other end users to offer for sale, sell, lease, use (including through leasing), purchase, and otherwise acquire the ’801 Accused Products. *See, e.g.*, https://www.hyundaicapitalamerica.com/InvestorRelations.html (HCA “servicing approximately 2.7 million customers and 1,800 dealers across the U.S.”). By providing such instructions, financing, and support, Hyundai-Kia knows (and has known), or should know (and should have known), that its actions have actively induced, and continue to actively induce, infringement of the ’801 Patent.

***Damages***

163. AutoNavigare has been damaged by Hyundai-Kia’s infringing conduct described in this Count. Hyundai-Kia is, thus, liable to AutoNavigare in an amount that adequately compensates it for Hyundai-Kia’s infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

164. On information and belief, despite having knowledge of the ’801 Patent and knowledge that it is directly and/or indirectly infringing one or more claims of the ’801 Patent, Hyundai-Kia has nevertheless continued its infringing conduct and disregarded an objectively high likelihood of infringement. Hyundai-Kia’s infringing activities relative to the ’801 Patent have,

thus, been, and continue to be, willful, wanton, and deliberate in disregard of AutoNavigare's rights with respect to the '801 Patent, justifying enhanced damages under 35 U.S.C. § 284.

## CONCLUSION

165. AutoNavigare is entitled to recover from Hyundai-Kia damages it has sustained as a result of Hyundai-Kia's wrongful acts and willful infringements in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

166. AutoNavigare has incurred, and will incur, attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and, in such case, AutoNavigare is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

AutoNavigare hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

AutoNavigare respectfully requests that the Court find in its favor and against Hyundai-Kia, and that the Court grant AutoNavigare the following relief:

(i) Judgment that one or more claims of the Asserted Patents have been infringed, either literally and/or under the doctrine of equivalents, by Hyundai-Kia;

(ii) Judgment that one or more claims of the Asserted Patents have been willfully infringed, either literally and/or under the doctrine of equivalents, by Hyundai-Kia, requiring Hyundai-Kia to pay enhanced damages under 35 U.S.C. § 284 and attorneys' fees and costs incurred by AutoNavigare in prosecuting this action as set

forth under 35 U.S.C. § 285;

(iii) Judgment that Hyundai-Kia account for and pay to AutoNavigare all damages and costs incurred by AutoNavigare because of Hyundai-Kia's infringements and other conduct complained of herein, including accounting for any sales or damages not presented at trial;

(iv) Judgment that Hyundai-Kia account for and pay to AutoNavigare a reasonable, ongoing, post-judgment royalty because of Hyundai-Kia's infringements, including any continuing infringing activities not already accounted for, and other conduct complained of herein;

(v) A permanent injunction enjoining Hyundai-Kia and its officers, agents, representatives, assigns, licensees, distributors, employees, related entities, and all those acting in privity or in concert with Hyundai-Kia from further infringement of the Asserted Patents;

(vi) Judgment that AutoNavigare be granted pre-judgment and post-judgment interest on the damages caused by Hyundai-Kia's infringements and other conduct complained of herein;

(vii) Judgment that this case is exceptional under the provisions of 35 U.S.C. § 285 and award enhanced damages; and

(viii) Such other and further relief as the Court deems just and equitable.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Edward R. Nelson III*
Edward R. Nelson III
State Bar No. 00797142
NELSON BUMGARDNER CONROY PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
Tel: (817) 377-9111
ed@nelbum.com

Ryan P. Griffin
State Bar No. 24053687
Nathan L. Levenson
State Bar No. 24097992
Brandon G. Moore
Texas Bar No. 24082372
NELSON BUMGARDNER CONROY PC
2727 N. Harwood St., Suite 250
Dallas, TX 75201
Tel: (817) 377-9111
ryan@nelbum.com
nathan@nelbum.com
brandon@nelbum.com

Timothy E. Grochocinski
Illinois Bar No. 6295055
C. Austin Ginnings
New York Bar No. 4986691
NELSON BUMGARDNER CONROY PC
745 McClintock Road, Suite 340
Burr Ridge, IL 60527
708.675.1975
tim@nelbum.com
austin@nelbum.com

**Attorneys for Plaintiff**
**AutoNavigare LLC**